VICTORIA L. FRANCIS
Assistant U.S. Attorney
U.S. Attorney's Office
2601 Second Avenue North, Box 3200
Billings, MT 59101
Phone: (406) 247-4633
Fax: (406) 657-6989
E-mail: victoria.francis@usdoj.gov

ATTORNEY FOR PLAINTIFF
United States of America

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV-12- |
| Plaintiff, | |
| vs. | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_** |
| REAL PROPERTY LOCATED IN HUNTINGTON BEACH, CALIFORNIA | |
| Defendant. | |

S:\civil\2012v00211\complaint for forfeiture FINAL.wpd

Plaintiff, United States of America, by its attorney, Victoria L.

Francis, Assistant United States Attorney for the District of Montana,

brings this complaint and alleges as follows:

## NATURE OF THE ACTION

1. This is an action to forfeit and condemn to the use and benefit

of the United States of America real property located in Huntington

Beach, California, under 18 U.S.C. § 981(a)(1)(A) for violations of 18

U.S.C. § 1960, as real property that is involved in a transaction or

attempted transaction in violation of 18 U.S.C. § 1960 or any property

traceable to such property.  The real property is located in Orange

County California and consists of the following:

> Property located on Seabourne Drive, Huntington Beach, Orange
> County, California, more particularly described as follows:

> Parcel 1:
> Unit 58 (the "Unit") as shown and described in the Condominium
> Plan for Mystic Pointe Tract No. 16192 (Phase 5) (together with
> any amendments thereto, collectively, the "Plan") which
> encumbers a portion of Lot 1 of Tract No. 16192, as such tract is
> shown on the Subdivision Map ("Map") in the City of Huntington
> Beach, County of Orange, State of California, filed in Book 826, at
> Pages 29 to 32, inclusive, of Miscellaneous Maps in the Office of
> the Orange County Recorder, which plan was recorded on March
> 20, 2002, as Instrument No. 02-226945 in Official Records of
> Orange County, California ("Official Records").

Excepting therefrom: all oil, oil rights, natural gas rights, mineral rights, and other hydrocarbon substances by whatever name known, together with appurtenant rights thereto, without, however, any right to enter upon the surface of said land nor any portion of the subsurface lying above a depth of 500 feet, as excepted or reserved in instruments of record.  Except all water, claim or rights to water, in or under said land.

Parcel 2:
An undivided one-twelfth (1/12) fee simple interest as a tenant in common in and to the condominium common area described in the plan.

Parcel 3:
Exclusive easements appurtenant to Parcel No. 1 and Parcel No. 2 described above, over the association property described in the plan, for deck, porch, attic heater, and air conditioning compressor and pad purposes (as applicable), as approximately shown and identified in the plan, and as described in the neighborhood restrictions, and for internal and external telephone wiring designed to serve a single unit.

## JURISDICTION AND VENUE

2.  Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property under 18 U.S.C. § 981(a)(1)(A).  This court has jurisdiction over this action under 28 U.S.C. §§ 1345 and 1355.

3.  Venue is proper in this district, pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and (B), and 1395(a),because this is a civil proceeding for the forfeiture of property in which substantial acts or omissions giving

rise to the forfeiture occurred in the state and district of Montana, and that violations giving rise to the forfeiture accrued in this district.

## THE DEFENDANT *IN REM*

4. The defendant consists of real property located in Orange County, California, more particularly described in paragraph 1 above.

## FACTS SUPPORTING FORFEITURE

### A. Introduction

5. Section 1960(a) of Title 18 makes it a crime to knowingly conduct, control, manage, supervise, direct or own all or part of an unlicensed money transmitting business. An unlicensed money transmitting business includes a business that affects interstate or foreign commerce in any manner or degree, and that fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or the regulations prescribed under such section. 18 U.S.C. § 1960(b)(1)(B). The regulations prescribed under 31 U.S.C. Section 5330 are currently codified at 31 C.F.R. Part 1022. These regulations in turn incorporate in large part the registration and reporting requirements set forth at 31 C.F.R. Part 1010. Congress

enacted the statutes at issue amid concerns that money transmitting businesses facilitate money laundering.

6. The Black Market Peso Exchange uses money transmitting businesses as intermediaries between illicit proceeds and South American businessmen.  The money brokers sell the illicit dollars they buy in the United States to South American businesses that use the money to pay for U.S. products which are exported to South America. The products are sold in South America for pesos which are in turn paid to a peso broker.  The peso broker arranges for payment to the U.S. supplier through a money transmitter who controls accounts in the United States that are filled with illicit proceeds.  The U.S. suppliers are paid in U.S. currency obtained from illicit sources, while the pesos are paid to the drug traffickers and other criminal enterprises in South America.  This Black Market Peso Exchange operates as an underground financial system used to foster money laundering and to evade reporting and record keeping requirements mandated by the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., as well as foreign exchange and import laws, tariffs and taxes.

7.  German P. Coppola conspired with La Moneta Cambio, S.A. Rivadavia located in Mar del Plata, Argentina, to violate 18 U.S.C. § 1960 and the Bank Secrecy Act and Treasury Regulations, by moving millions of dollars through accounts set up by Coppola through sham corporations in several states including Montana.  Coppola operated the sham corporations from the defendant property despite misrepresentations to several Montana banks that his corporation Velox, Inc., was based in Montana and providing a Montana business address in Billings, Montana.  Specifically, the Coppola run Money Service business Velox, Inc. conducted no significant business at the addresses provided to regulatory authorities, including the Montana address.  Rather mail addressed to Velox, and the other money service businesses ("MSBs) was forwarded to the defendant property and the deposits into Montana banks involved financial instruments sent from the defendant property.

8.  At the time of the execution of a search warrant on November 8, 2011 at the subject property, evidence was found that Coppola was operating the current money service business, Trade Wings, from the defendant property.  On December 13, 2011, soon after the search was

conducted German Coppola transferred the subject property to his

father, Pablo Osvaldo Coppola.  On that same date Pablo Coppla in

turn transferred the subject property to German Coppola's siblings,

Romina Coppola, Bernardo Coppola, and Glenda Coppola.

9.  German Coppola is a non-United States citizen who owned the

Defendant Seabourne Drive property at the time of the events in

question.  Coppola is a citizen of Argentina. Coppola frequently

traveled from Argentina to the United States.

10.  German Coppola operated at least three Money Service

Businesses ("MSBs") throughout the United States, including one such

business, Velox, Inc. in Montana.  In addition, Coppola owned and

operated Amerifast, Inc. as a money service business out of South

Carolina.  Coppola also owned a business in California under the name

of Trade Wings, Inc. operated through a straw person as a money

service business although not registered with FinCEN or the State of

California.  Coppola is the only employee of the Money Service

Businesses and is also the compliance officer responsible for  filing any

reports regarding the importation of monetary instruments exceeding

$10,000.

11.  A Money Service Business is required to establish and maintain an anti-money laundering compliance program that, at a minimum: (A) provides internal policies, procedures, and controls designed to guard against money laundering; (B) provides for an individual or individuals to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and anti-money laundering requirements; (C) provides for an ongoing employee training program: and (D) provides for independent testing for compliance conducted by the individual or an outside party for the money services businesses. 31 C.F.R. 1022.210.  It also includes at a minimum filing reports, creating and retaining records and responding to law enforcement requests.

12.  Notwithstanding Coppola's use of the defendant property as means to operate the Coppola MSBs remotely, he did not register either Velox Inc. or Amerifast, Inc. with FinCEN as an MSB that in fact was operated in California, as required by 31 U.S.C. § 5330 and 18 U.S.C. § 1960.  Coppola also did not register these businesses with the State of California as money service businesses as required by the state of California and a violation of 18 U.S.C. Section 1960(b)(1)(A).

13.   The investigation by the United States has not revealed any source of income for German Coppola other than the Coppola run money service businesses.  After the search conducted by law enforcement in November, 2011, German Coppola was asked to meet with law enforcement.  Coppola has not responded to this law enforcement request as required by 31 C.F.R. 1022.210(d)(1)(i)(D).

**B.  Velox Inc.**

14.   Coppola is the only employee of Velox Inc. and is also its compliance officer, responsible for reporting suspicious activity to FinCEN.  He is also the President, Treasurer, Secretary and Director of Velox.

15.   Coppola registered Velox with FinCEN in approximately July 2009 with a business address at 1925 Grand Avenue, Billings, Montana.  At that time, Coppola signed a registration form indicating that Velox was in fact located in Montana, and that the Grand Avenue address was the location of supporting documentation regarding Velox and any other information required to comply with the registration requirements of 18 U.S.C. § 5330 and regulations issued thereunder.

16.   Coppola opened bank accounts for Velox with Wells Fargo Bank in Billings, Montana, in July 2009.  He described Velox as a domestic bill pay and money transfer business.  Coppola informed the bank that Velox receives funds from its clients in South America and invests the funds on their behalf.  The bank required Coppola to submit an independent report on his compliance with the Bank Secrecy Act and its anti-money laundering provisions.  As part of this compliance report Coppola represented that his customers would be acquired based on trusted relationships from agents such as La Moneta, as well as personal referrals.

17.   As of the end of December 2009, all of the funds deposited with Wells Fargo remained on deposit in a non-interest bearing account, and had not been invested.  The accounts had been set up to allow Coppola to deposit checks electronically and to allow Coppola to initiate wire transfers telephonically. Wires into the accounts were primarily from Argentina and Uruguay.  Wires out of the accounts were to individuals and businesses in multiple countries, including the United States.

18.  The checking activity in Velox's Wells Fargo account in
Montana consisted of numerous checks deposited into the accounts that
were third party checks written to individuals primarily from South
American countries.  These third party checks did not have a "pay to
the order of" statement for endorsement by Coppola or Velox.  A small
stamp of a frog appears on the back of many of these checks.  Such
stamps have been associated with money transmitters and check
movers who deal in the Black Market Peso Exchange.

19.  Other third party checks deposited into the Velox Wells Fargo
accounts include checks to Maynard Services, S.A.  These checks are
from various banks and were all processed somewhere outside the
United States as evidenced by date stamps in the Spanish language.
None of these checks had "pay to the order of" instructions but were
simply endorsed by a Maynard Services stamp and remotely deposited
into Coppola's Wells Fargo account.  While the checks were all written
on various dates in November and December 2009, they were all
deposited into the Velox account on January 28, 2010, and stamped in
Spanish with a January 27, 2010 date, exhibiting a lengthy float time.
Many of these checks were stamped on the back with a "7" and a circle,

and none of these checks have any payor name or address, all of which is consistent with checks used in the Black Market Peso Exchange.

20.  From an internet search, Maynard Services SA appears to be located in Uruguay.  The Maynard Services checks deposited on January 28, 2010 included checks exceeding $10,000 and the total for the January 28, 2010 deposit for the Maynard Services checks was $212,847.  Coppola did not file a Currency Monetary Instruments Report as required under  31 U.S.C. § 5316.

21.  In addition to the Maynard Services checks deposited on January 28, 2010, were several checks written to Betaex Ltda.  An internet search on Betaex revealed that it is a money exchange business located in Santiago, Chile.  All of these third party checks were date stamped in Spanish on January 27, 2010, a day before the deposit in the Montana accounts.  There were no Currency and Monetary Instrument Reports filed with regard to any of these checks.

22.  In addition to the third party checks that were remotely deposited, Coppola deposited a number of other checks into his Wells Fargo Velox account on January 27, 2010 that had no payor or account holder information.  Records show that 37 checks were deposited for a

total of $373,594.  Many of these checks were for amounts just under

$10,000 (several between $9000 and $9500), they originate from

numerous banks and are signed by various account holders.  While

these checks show Velox as a payee, it is apparent that the handwriting

identifying Velox as payee is the same, indicating that the checks were

drafted "in blank" from various accounts, and the same person filled in

the payee portion of the checks.  These checks also have the

characteristic "stamps" on the back reflecting use in the Black Market

Peso Exchange.

   23.  Wells Fargo closed the Velox accounts in March 2010.  From

November 2009 to March 2010 approximately $14 million flowed

through the accounts.

   24.  In March, 2010, Coppola then opened Velox Inc. bank

accounts with Stockman Bank in Billings, Montana.  The same activity

as described with Wells Fargo occurred at Stockman Bank with the

Velox accounts.  Most of the deposits into the accounts were checks

mailed to Stockman Bank from California as Stockman Bank did not

approve remote depositing.  A witness has provided information that

third party checks were sent to the Defendant property address, some

already endorsed to Velox, Inc., and some with no payee information.
The witness was requested to sign for German Coppola and then mail
the checks to Stockman Bank for deposit.  Many of the checks were
third party checks including 8 totaling $780,000 payable to a person
from the Aria Casino in Las Vegas. No CMIRs were filed regarding
these deposits.  Third party checks included payroll checks, Australian
government social security checks, checks from the United States
Treasury, the State of Israel, the Embassy of Kuwait, Google, Inc.,
Marriott International and others.  Coppola told Stockman Bank that
he was transferring his business from California to Montana, and that
he was staying in Billings.  Instead, Coppola was mailing his deposits
to Stockman from the Defendant property.

25.  The Velox account was closed by the Stockman Bank in
October or November 2010 after deposits of over $1.7 million had been
deposited, due to numerous third party checks in large amounts
payable to foreign nationals and casino checks in large denominations
of $100,000 or more endorsed over to Coppola.  The funds remaining in
the Stockman Bank, Velox Account xxxxxx6308 in the amount of
$975,058.37, were wired on November 15, 2010 to German P. Coppola's

Wells Fargo Bank account number xxxxxx3268 in California, which

account has the address of the Defendant property.  German Coppola

on November 16, 2010 wrote a check from that account to Pablo

Osvaldo Coppola, his farther, which check was deposited into Pablo

Coppola's Wells Fargo Bank account xxxxxx1920 on November 16,

2010.  On November 17, 2010 Pablo Coppola wired $961,788 in funds to

his TD Ameritrade Account ending in number 7927.  On November 18

and 22, 2010, Pablo Coppola gave instructions to wire a total of

$961,788 from the TD Ameritrade account into three bank accounts set

up for Trade Wings, Inc. an additional money services business created

by German Coppola.

    26.  Coppola, through Velox Inc., had also opened accounts with

Yellowstone Bank in Billings, Montana in June 2010.  He did not begin

to deposit funds into the Yellowstone Bank accounts until October,

2010 when his Stockman  Bank accounts were closed.  Coppola started

to deposit third party checks, similar to those described above, which

he mailed to Yellowstone Bank from the defendant  property address.

Yellowstone Bank became concerned about the nature of the deposits

and at the end of October 2010 refused to accept any additional
deposits.

27.   Coppola provided to another bank in Montana where he
attempted to open accounts,  a Money Service Business Compliance
Report completed in order to demonstrate that Velox met baseline
criteria under the statutes and regulations.  In this report Coppola
represented that he would have an ongoing relationship with
customers, along with reviewing and maintaining documentary
information from his customers.  He represented that background
checks were performed on customers in Argentina, and Claimed Velox
would carefully monitor transactions to ensure an appropriate
understanding of those transactions, as well as checking photo ID and
running criminal history checks on customers.   No evidence exists to
show that Coppola, as the only employee of Velox, was meeting any of
the criteria he claimed he would meet, nor could he likely do so when
he was depositing millions of dollars in checks that were drafted and
deposited on the same day with no account holder information other
than a signature, and at least one third party check having been

confirmed as stolen, as well as no CMIR reports having been filed by
Coppola or Velox.

28.  Based on this activity, FBI Special Agent Vandenbosch
further investigated Velox's purported business location at 1925 Grand
Avenue, Billings,  Montana.  The realtor/property manager was
interviewed showing that Coppola began renting a "virtual office" on
July 1, 2007.  Coppola paid $75 per month and requested the following
services: mail recipient/forwarding, conference room (maybe once a
year), corporate name at the front door directory, a suite number
assigned in reference to the directory, an available person to receive
occasional FedEx envelopes, and lease agreement under the corporate
name.  In April 2009, Coppola began renting an actual office for $150
per month.  Coppola did not have any employees.  Coppola rarely came
to Billings.  Coppola told the realtor that he was from Argentina and
would invest money in the United States for clients that lived in
Argentina or Chile.  Coppola received mostly bank statements and
checks.  The realtor would forward Coppola's mail to the street address
for the Defendant property.

29.  On March 22, 2011, the realtor advised that Coppola went back to a "virtual office" and asked the realtor to sell a computer and printer.  The realtor stated that the items were still in the box and did not appear to have ever been used.

## C. Amerifast

30.  Amerifast, Inc. was registered with FinCEN in March 2009 with a business address of 215 E.Bay St., Charleston, South Carolina. Coppola is the only employee of Amerifast and is also the President, Treasurer, Secretary, Director and Compliance Officer.  Coppola rented space for Amerifast in Charleston, but rarely visited the office.  The lease application lists Coppola's address as the Defendant property. Amerifast did not have any employees working in the Charleston office. Coppola traveled to Charleston only when he needed to deposit checks and hired an unidentified female to pick up his mail.

31.  Amerifast opened back accounts with RBC Bank in South Carolina in April 2009, and began depositing large wire transfers and numerous checks via remote image deposits.  The wire transfers originated from Panama, Uruguay, and other Central and South

American countries.  No CMIRs were filed with respect to any of these deposits.

32.  Coppola opened additional bank accounts at First Federal Savings & Loan in South Carolina on July 1, 2010. Coppola claimed that the accounts were opened in connection with Amerifast's business as a bill paying service for Argentine students in the United States. However, the checks Coppola remotely deposited were payable to businesses or written on business checking accounts.  Many of the checks deposited had the payee handwritten as Amerifast.  Funds wired out of the accounts often did not give the address of the recipients.  No CMIRs were filed.  First Federal closed Amerifast's account on September 7, 2010.

**D. Trade Wings**

33.  Trade Wings, Inc. was incorporated in the State of California on April 21, 2010, with an address listed as 3991 MacArthur Blvd, Newport Beach, California.  Noelia Salerno, a citizen of Argentina is listed as the president and CEO of Trade Wings.  Based on evidence obtained from a search warrant, it was revealed that German Coppola asserts control and direction over Trade Wings.  Coppola communicated

frequently with Salerno and directed her on how to set up the business and how to approach bankers.  Coppola received bills related to Trade Wings and paid the bills.

34.  Trade Wings did not in fact operate out of the MacArthur Blvd. location, which was instead a virtual office, with the mail addressed to Trade Wings being forwarded to the subject property.

35.  Business conducted through the Trade Wings, Inc. accounts opened at Wells Fargo and Bank of the West was similar to that described relative to Velox in Montana and Amerifast in South Carolina.   A total of $12,296,237 had been deposited into the Wells Fargo account between August 2010 and November 2011.  During that same period, a total of $12,107,314 was transferred out.  The wire transfers bore no apparent relationship to the purported import/export business of Trade Wings.  Checks deposited into the Bank of the West account included checks from foreign countries without a name or address for the account holder/payor and also with the payee written in by someone other than the maker.  No CMIRs were filed related to the checks.  German Coppola and Pablo Coppola had on-line access to the Trade Wings accounts at Bank of America.  Other Trade Wings

accounts were opened in California with the same activity as described above.

36. The purported owner of Trade Wings, Salerno, has stated to federal agents that she is not the owner, that German Coppola is the owner of Trade Wings Inc., and that Coppola handled the business.

37. The totality of the circumstances demonstrates that the Defendant property was involved in violations of 18 U.S.C. § 1960, in that Coppola ran several sham money transmitting businesses from the Defendant property, rather than from Billings, Montana and the other states he claimed on FinCEN registration for the sham corporation's place of business resulting in false representations on the application in violation of 31 U.S.C. 5330; and that he further violated the regulations prescribed by section 5330 from his operation of his businesses from the Defendant property by failing to implement and maintain the anti-money laundering program and further failing to meet the reporting requirements or the required cooperation with law enforcement as set forth in 31 C.F.R. Part 1022 and regulations further incorporated thereunder.

38.  Bank of America, N.A. may have a secured interest in the Defendant property by virtue of a Deed of Trust executed by German P. Coppola in the original amount of $417,000 and recorded with the Orange County Clerk and Recorder on April 28, 2008 under instrument # 2008000198963.  Based on information currently known the secured creditor Bank of America has a lien interest in the property that would be paid from the proceeds of the sale of the forfeited property.

## CLAIM FOR RELIEF

39.  Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 38 above.

40.  The defendant real property constitutes property involved in or traceable to violations or attempted violations of 18 U.S.C. § 1960 .

41.  As a result of the foregoing, the defendant property is liable to condemnation and forfeiture to the United States for its use, in accordance with 18 U.S.C. § 981(a)(1)(A).

**DATED** this 30th day of November, 2012.

MICHAEL W. COTTER
**United States Attorney**

**VICTORIA L. FRANCIS**
**Assistant U.S. Attorney**
**Attorney for Plaintiff**

# VERIFICATION

I, Todd Wacaser, Special Agent for the Internal Revenue Service, hereby verify and declare under penalty to perjury that I have read the foregoing Verified Complaint In Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to my own knowledge, except that those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, including interviews of witnesses, reviews of financial information provided under subpoena, information obtained from surveillance, as well as my investigation of this case together with other federal law enforcement agents.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated this 30th day of November, 2012.


Todd Wacaser
Special Agent
Internal Revenue Service